```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3 4 13
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

OSCAR GOMEZ,

                Defendant.

------------------------------------X

11 Cr. 96-01(RWS)

SENTENCING OPINION

**Sweet, D.J.**

On December 9, 2011, Oscar Gomez ("Gomez" or "Defendant") appeared before the Honorable Frank Mass in the Southern District of New York and allocated the stipulations in a plea agreement. For the reasons set forth below, Gomez will be sentenced to 6 months' imprisonment to be followed by 3 years supervised release. Defendant will forfeit to the United States all property involved in the offense or traceable to it, pursuant to 18 U.S.C. § 982(a)(2) and 18 U.S.C. § 982. Gomez will also be required to pay a special assessment of $100.

**Prior Proceedings**

Indictment 11-CR-96(RWS) was filed in the Southern

1

District of New York on February 1, 2011.

Count 1 charged that from about 2007, up to and including about January 2008, in the Southern District of New York and elsewhere, Gomez and others conspired to transport cash in numerous financial transactions which involved the proceeds of health care fraud, knowing that such transactions were designed to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

On December 9, 2011, Gomez appeared before the Honorable Frank Maas in the Southern District of New York and allocuted to the above charge in accordance with a plea agreement.

Gomez's sentencing is currently scheduled for March 28, 2013.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in

United States v. Booker, 543 U.S. 220 (2005), and the Second

Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d

Cir. 2005), the sentence to be imposed was reached through

consideration of all of the factors identified in 18 U.S.C.

§ 3553(a), including the advisory Guidelines.  Thus, the

sentence to be imposed here is the result of a consideration of:

> (1)   the nature and circumstances of the offense and
>       the history and characteristics of the defendant;
>
> (2)   the need for the sentence imposed –
>
>> (A)   to reflect the seriousness of the offense,
>>       to promote respect for the law, and to
>>       provide just punishment for the offense;
>>
>> (B)   to afford adequate deterrence to criminal
>>       conduct;
>>
>> (C)   to protect the public from further crimes of
>>       the defendant; and
>>
>> (D)   to provide the defendant with needed
>>       educational or vocational training, medical
>>       care, or other correctional treatment in the
>>       most effective manner;
>
> (3)   the kinds of sentences available;
>
> (4)   the kinds of sentence and the sentencing range
>       established for –
>
>> (A)   the applicable category of offense committed
>>       by the applicable category of defendant as
>>       set forth in the guidelines . . .;
>
> (5)   any pertinent policy statement . . . [issued
>       by the Sentencing Commission];
>
> (6)   the need to avoid unwarranted sentence

3

> disparities among defendants with similar
> records who have been found guilty of
> similar conduct; and
>
> (7)   the need to provide restitution to any victims of
>        the offense.

18 U.S.C. § 3553(a).   A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not.   See Crosby, 397 F.3d at 114-15.

## The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Gomez's personal and family history.

## The Offense Conduct

The following description draws from the PSR.   The specific facts of the underlying conduct are adopted as set forth in that report.

From at least 2007, through 2008, several individuals participated in a scheme to fraudulently bill Medicare for

millions of dollars in durable medical equipment using stolen

identity information from both Medicare patients and physicians

(the "Medicare fraud scheme").  Specifically, participants in

the Medicare fraud scheme purchased the identities of real

Medicare beneficiaries and then used that stolen information to

submit false claims to Medicare for the purchase of durable

medical equipment "DME."  The participants created false

prescriptions for those fraudulent DME claims in the names of

physicians whose identity information had also been stolen.  In

truth and in fact, because the claims were false, no medical

equipment was ever obtained for the Medicare beneficiaries.

In furtherance of the Medicare fraud scheme, and to

hide the scheme, the participants, who were primarily based in

Miami, Florida, used a shell company, Health First Group of New

York, New York, to submit the fraudulent billings for DME to

Medicare and to receive payments from Medicare.  One of the

participants in the Medicare fraud scheme, herein known as

("CC-1"), opened a bank account in New York, New York, for

Health First Group to receive the payments from Medicare that

were obtained by fraud (the "Health First Account").

From about 2007, up to and including about January

2008, Health First Group submitted over $1.5 million in false DME claims, and received over $200,000 in payments on its fraudulent Medicare billings, which were deposited into the Health First Account.

Gomez and others participated in a conspiracy to conceal the nature, origin, and ownership of the proceeds derived from the Medicare fraud scheme. Specifically, members of the conspiracy transferred money from the Health First Account in New York, New York, into bank accounts in Florida that were held in the names of various businesses and individuals but were in fact controlled by members of the conspiracy ("The Money Laundering Accounts"). Thereafter, participants in the conspiracy cashed checks or withdrew money from the Money Laundering Accounts. These funds were ultimately transferred back to CC-1, less a commission taken by the members of the conspiracy. At least $200,000 in proceeds from the Medicare fraud scheme were transferred from the Health First Account to the Money Laundering Accounts.

In furtherance of the money laundering conspiracy, Gomez referred CC-1 to another co-conspirator ("CC-2"), who worked at a Bank Atlantic branch in Hialeah, Florida, and who

used that position to open Money Laundering Accounts using the identities of other individuals. Thereafter, CC-1 provided Gomez with checks from the Health First Account, which Gomez caused to be deposited into the Money Laundering Accounts. Gomez recruited others to cash checks or withdraw money from the Money Laundering Accounts, the proceeds of which were later transferred back to CC-1.

According to the Government, Gomez is to be held accountable for laundering between $120,000 and $200,000.

## The Relevant Statutory Provisions

The maximum term of imprisonment for Count One is 20 years, pursuant to 18 U.S.C. § 1956(h).

If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2).

The Defendant is eligible for not less than one nor more than five years' probation, pursuant to 18 U.S.C. § 3561(c)(1).

7

The maximum fine is $500,000, pursuant to 18 U.S.C. §
1956(h).

A special assessment of $100 is mandatory, pursuant to
18 U.S.C. § 3013.

## The Plea Agreement

Pursuant to a written plea agreement, the defense and
the Government stipulated to the following:

- Section 2S1.1 applies to the offense charged in the
Indictment;

- Pursuant to §2S1.1(a)(2), the base offense level is 8
plus the number of levels from the table in §2B1.1
corresponding to the value of the laundered funds; and
pursuant to §2B1.1(b)(1)(F), 10 levels are added because
the offense involved more than $120,000, but less than
$200,000, resulting in a base offense level of 18;

- Pursuant to §2S1.1(b)(2)(B), because the defendant was

convicted under 18 USC §1956, the offense level is
increased by 2 levels;

- Assuming the defendant accepts responsibility for his
actions, a three-level reduction is warranted, pursuant to
§3E1.1(a) and (b);

- The total offense level is 17;

- The defendant's Criminal History Category is II;

- Based on a total offense level of 17, the sentencing
range is 27 to 33 months and the fine range is $5,000 to
$50,000;

- Finally, the parties agreed that neither a downward nor
an upward departure from the stipulated Guidelines range
set forth above is warranted and accordingly, neither party
will seek any departure or adjustment pursuant to the
Guidelines that is not set forth in the agreement; however,
either party may seek a sentence outside of the stipulated
Guidelines range, based upon the factors to be considered
in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

**The Guidelines**

The November 1, 2010 edition of the United States
Sentencing Commission Guidelines Manual has been used in this
case for calculation purposes, pursuant to § 1B1.11(a).  The
Court finds the following with respect to Defendant's applicable
offense level, criminal history, recognition of responsibility,
and term of imprisonment:

The Guideline applicable to a violation of 18 USC
1956(h) is found in §2S1.1.  Pursuant to §2S1.1(a)(2), the base
offense level is 8 plus the number of levels from the table in
§2B1.1 corresponding to the value of the laundered funds.  As
such, pursuant to §2B1.1(b)(1)(F), 10 levels are added because
the offense involved more than $120,000, but less than $200,000,
which results in a base offense level of 18.

Pursuant to §2S1.1(b)(2)(B), because the defendant was
convicted under 18 USC § 1956, the offense level is increased by
two levels.

Based on the defendant's plea allocution and the

defendant's timely notification of his intention to plead guilty, pursuant to §3E1.1(a) and (b), the offense level is reduced three levels.

Accordingly, the applicable offense is 17.

According to the arrest affidavit, on May 23, 2004, Gomez walked into a Publix grocery store and attempted to cash a $465 check using a fictitious driver's license bearing the name "Eduardo Gonzalez." Gomez was convicted of Possession of Stolen Driver's License and Uttering a Forged Instrument. On January 28, 2005, adjudication was withheld and the Defendant was sentenced to 3 years' probation. Pursuant to 4A1.2(f), the conviction warrants zero criminal history points.

According to the arrest affidavit, on January 8, 2005, Gomez attempted to purchase a pressure washer cleaner at a Home Depot using a fraudulent Chase credit card and a Florida driver's license bearing the name "Adrian Torrez." After the Defendant was approached by a loss prevention representative, he walked away from the check-out line. Defendant was convicted of Grand Theft in the Third Degree; Possession of a Stolen Driver's License; and credit card forgery in the 11th Circuit Court in

Miami, Florida.  On January 28, 2005, Defendants was sentenced
to 3 years' probation.  Pursuant to 4A1.1(c) and 4A1.2(e)(2),
this conviction warrants one criminal history point.

Other arrests include a conviction on June 20, 2000
for Unlawful Possession of a Suspended Driver's License by the
Hialeah Gardens Police Department.  According to the arrest
affidavit, after the defendant received a parking ticket for
blocking a fire hydrant, the police officer asked the defendant
for his driver's license.  When the officer performed a record
check on the driver's license provided by the defendant, he
found that the license had been recently suspended due to the
defendant's failure to pay prior citations and that a bench
warrant for his arrest had been issued.

On April 18, 2001, the defendant was observed
operating a motor cycle without wearing proper eyewear.  A
routine records check revealed that warrants were outstanding,
along with 13 license suspensions.

On December 12, 2003, the defendant was observed
driving a Cadillac automobile which was rented from the victim
by the defendant using a fraudulent American Express card and

Florida driver's license.

It appears that the defendant was re-arrested on January 10, 2005, on the above charge which is related to criminal conduct which is the subject of his January 8, 2005, arrest.

On November 28, 2008, after the defendant was stopped for a routine traffic violation, he was asked for his driver's license.  He stated that his license was suspended and had no other identification on his person.  A record check revealed that the defendant had two suspensions.

On June 17, 2009, the defendant used a victim's information to obtain checks and had the checks sent to another residence where a witness was told that they were magazines. The defendant went to the witness' address where he retrieved the package.

The criminal convictions above result in a subtotal criminal history score of one.

At the time the instant offense was committed, the

Defendant was on probation.  Pursuant to §4A1.1(d), two points are added.

The total of the criminal history points is 3. According to the sentencing table at Chapter 5, Part A, 3 criminal history points establish a Criminal History Category of II.

Based on a total offense level of 17 and a Criminal History Category of II, the guideline range for imprisonment is 27 to 33 months.

The guideline range for a term of supervised release is at least one year but not more than three years, pursuant to §5D1.2(a)(2).  The Court shall order a term of supervised release when required by statute (§5D1.1(a)(1)), or except for a deportable alien who is likely to be deported after imprisonment, when a term of imprisonment of more than one year is imposed (§5D1.1(a)(2)).  Pursuant to §5D1.1(c), the Court should not ordinarily impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who is likely to be deported after serving a term of imprisonment.  In any other case, the

Court may order a term of supervised release, pursuant to §5D1.1(b).

Because the applicable guideline range is in Zone D of the Sentencing Table, the defendant is not eligible for probation, pursuant to §5B1.1, Application Note #2.

The fine range for the instant offense is from $5,000 to $500,000, pursuant to §5E1.2(c)(1) and (c)(4).

Subject to the defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,357.01 to be used for imprisonment, a monthly cost of $328.20 for supervision, and a monthly cost of $2,153.22 for community confinement.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified

in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines sentence is warranted in the instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant." Pursuant to 18 U.S.C. § 3553 (2)(A), the Court weighs the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

This Defendant, now age 31, reported that he has an eleventh grade education. He has one child and resides with his wife in Florida. His employment as a barber was verified by

U.S. Probation Officers located in Florida and according to
them, the defendant's supervisor is aware of the instant
offense.

In consideration that there was no loss caused by the
defendant in this case, a sentence calculated by the Guidelines,
seems unnecessary.  However, his history of contacts with law
enforcement which has resulted in multiple arrests, appears to
have failed to deter this defendant in what seems to be a
growing propensity to disobey the law.  As such, while a longer
term of incarceration as referenced above is not recommended,
some term of incarceration is necessary to satisfy and emphasize
to the defendant the objectives listed under 18 U.S.C. § 3553.

Taken into account all of the above, and young age,
the Court finds that a downward departure from the Guidelines
sentence is warranted.

**The Sentence**

For the instant offense, Gomez will be sentenced to 6
months' imprisonment and 3 years' supervised release.

Gomez is directed to report to the nearest United States Probation Office within seventy-two hours of release to commence his term of supervised release.  It is recommended that Defendant be supervised by the district of his residence.

As mandatory conditions of his supervised release, Clark shall:  (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; and (4) cooperate in the collection of DNA as directed by the probation officer.  The mandatory drug testing condition is suspended due to imposition of a special condition requiring drug treatment and testing.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

(1)   The Defendant shall cooperate with all inquiries and directives of the Immigration and Customs Enforcement and comply with this country's immigration laws.

(2)   The Defendant will participate in a program approved by the United States Probation Office, which program

may include testing to determine whether the defendant has reverted to using drugs or alcohol.  The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer.  The defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of the third-party payment.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

The Defendant shall forfeit the defendant's interest in the following property to the United States:  all property, real and personal, involved in the money laundering offense and all property traceable to such property.

A special assessment of $100, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for March 28, 2013.

It is so ordered.

New York, NY
February 27, 2013

ROBERT W. SWEET
U.S.D.J.